IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VS.                                   CRIMINAL NO. 3:26CR6-HTW-LGI

STEPHEN SPENCER PITTMAN




**TRANSCRIPT OF INITIAL APPEARANCE, ARRAIGNMENT & DETENTION
HEARING**



BEFORE THE HONORABLE LAKEYSHA GREER ISAAC
UNITED STATES MAGISTRATE JUDGE

JANUARY 20, 2026
JACKSON, MISSISSIPPI

APPEARANCES:

FOR THE GOVERNMENT:
  MATTHEW WADE ALLEN, ESQUIRE
  U.S. ATTORNEY'S OFFICE
  501 E. COURT ST., STE. 4.430
  JACKSON, MISSISSIPPI  39201

FOR THE DEFENDANT:
  MICHAEL L. SCOTT, ESQUIRE
  FEDERAL PUBLIC DEFENDER'S OFFICE
  200 S. LAMAR, SUITE 200-N
  JACKSON, MISSISSIPPI  39201


**<u>DIGITALLY RECORDED</u>**

TRANSCRIBED BY:  TERI B. NORTON, RMR, FCRR, RDR
                 501 E. COURT STREET, SUITE 2.500
                 JACKSON, MISSISSIPPI  39201
                 (601)608-4186

1    **THE COURT:** All right. Mr. Allen, would you call our

2    case, please.

3    **MR. ALLEN:** Yes, Your Honor. We are here in United

4    States of America versus Stephen Spencer Pittman. This is

5    Criminal Number 3:26CR6-HTW-LGI. The defendant is present in

6    the courtroom, along with his counsel, the Honorable Mike

7    Scott.

8    **THE COURT:** Okay. Thank you so much, Mr. Allen.

9    Good afternoon, Mr. Scott.

10    **MR. SCOTT:** Good morning, Your Honor.

11    **THE COURT:** All right. We are first going to do an

12    initial appearance and arraignment on the indictment, correct?

13    **MR. SCOTT:** Yes, Your Honor.

14    **THE COURT:** Okay. All right. Mr. Pittman, good

15    afternoon, sir.

16    **THE DEFENDANT:** Good afternoon, ma'am.

17    **THE COURT:** Would you raise your right hand, please.

18    **THE DEFENDANT:** Yes, ma'am.

19    **(OATH ADMINISTERED.)**

20    **THE COURT:** Thank you, sir. You can put your hand

21    down. I will advise you that you are now under oath and if you

22    are untruthful in answering any of my questions, your answers

23    may later be used against you in another prosecution for making

24    a false statement. Do you understand?

25    **THE DEFENDANT:** Yes, ma'am, absolutely.

1      **THE COURT:**  Tell me your full name for the record,

2  please.

3      **THE DEFENDANT:**  Stephen Spencer Pittman.

4      **THE COURT:**  How old are you, sir?

5      **THE DEFENDANT:**  Nineteen years of age.

6      **THE COURT:**  How far did you go in school?

7      **THE DEFENDANT:**  Three semesters of college.  I

8  graduated high school.

9      **THE COURT:**  Okay.  And are you able to speak, read,

10  write and understand the English language without any

11  difficulty?

12      **THE DEFENDANT:**  Yes, ma'am, absolutely.

13      **THE COURT:**  Okay.  I'm going to ask you a couple of

14  additional questions at this time, and I do need to advise you

15  that you are not required to answer this particular set of

16  questions, but if you choose to answer, your responses will

17  provide me with some helpful information.  Okay?

18      In the 48 hours before coming to court today, have you

19  taken any drug, medication or alcoholic beverage of any kind?

20      **MR. SCOTT:**  Your Honor, nothing that Mr. Pittman may

21  or may not have taken, his medical history or his physical

22  history, physical appearance, prohibits him from understanding

23  what is going on in court today and he is capable of going

24  forward.

25      **THE COURT:**  Thank you, Mr. Scott.  I appreciate that

1    representation.

2         Mr. Pittman, is there anything at all about your physical

3    or mental condition that would affect or limit your ability to

4    understand or participate today?

5              **THE DEFENDANT:**  No, ma'am.

6              **THE COURT:**  Okay.  Thank you, sir.  Now, you do have

7    certain rights in connection with these proceedings, and I do

8    want to make sure you are aware of your rights at this time.

9    You do have the right to remain silent.  If you've given any

10   statements before coming into court today, you don't have to

11   give my additional statements.  And if you start to make a

12   statement here in court today, you can stop at any time and

13   make no further statement.  But anything you do say here in

14   court today could be used against you today, and if you go to

15   trial, it could be used against you at trial.  Do you

16   understand your right to remain silent.

17             **THE DEFENDANT:**  Yes, ma'am, thank you.

18             **THE COURT:**  You also have the right to an attorney at

19   all stages of the proceedings against you, and if you cannot

20   afford an attorney, an attorney will be appointed to represent

21   you at no cost to you.  Do you understand your right to an

22   attorney?

23             **THE DEFENDANT:**  Yes, ma'am.

24             **THE COURT:**  Previously in your appearance before

25   Judge Harris, Mr. Mike Scott, of the Federal Public Defender's

1    office, was appointed to represent you in this case, and that

2    appointment is going to remain in effect.  And again, Mr. Mike

3    Scott is here present with you today.  You are here today

4    because you have been charged with a felony by way of

5    indictment by a grand jury here in the Southern District of

6    Mississippi.  Have you been provided with a copy of that

7    indictment?

8            **THE DEFENDANT:**  Yes, ma'am, I have.

9            **THE COURT:**  All right.  I'm going to go over with you

10   what you are charged with in the indictment as well as the

11   maximum potential penalty for the charge if you were to be

12   convicted.  You have been charged with arson under 18, United

13   States Code, Section 844(i).  That carries with it a maximum

14   potential penalty, if you were to be convicted, of not less

15   than five years and not more than 20 years imprisonment, not

16   more than a $250,000 fine, not more than 3 years supervised

17   release, and a $100 special assessment.

18       Mr. Scott, what says the defendant to a formal reading of

19   the full indictment here in open court?

20           **MR. SCOTT:**  Your Honor, Mr. Pittman waives the formal

21   reading of the full indictment in open court and enters a plea

22   of not guilty.

23           **THE COURT:**  Okay.  Thank you, Mr. Scott.

24       Mr. Pittman, I am going to enter some orders in your case.

25   First of all, I'm going to enter a trial order.  That's an

1   order that is going to give you your trial date, and it's also

2   going to tell you some other deadlines in the case.  So I will

3   advise you that your trial has been set for February 23rd,

4   2026, at 9:00 a.m., before District Judge Henry T. Wingate here

5   in this courthouse.

6        I'm also going to give you an order regarding discovery.

7   That's an order that's going to govern how information flows

8   and things are exchanged between you, as the defendant, and the

9   government, as the prosecution.

10        And finally, I'm going to enter a written order known as a

11   *Brady* order.  That's an order that governs the prosecutions,

12   disclosure obligations under *Brady versus Maryland* and it's

13   progeny, and it also sets forth the consequences to the

14   government for any violation of that order.

15        So I'm going to request that you and Mr. Scott sign both

16   the trial and the discovery order to acknowledge that you did

17   receive those here today, and then I'm going to ask Mr. Scott

18   and Mr. Allen to sign the *Brady* order.

19        (All parties sign respective orders.)

20             **MR. SCOTT:**  May I approach, Your Honor?

21             **THE COURT:**  Yes, you may, Mr. Scott.

22        All right.  Mr. Allen, what is the government's position

23   regarding release or detention?

24             **MR. ALLEN:**  Your Honor, the government is moving for

25   detention pursuant to two statutory provisions:  One, 18,

1   United States Code, Section 3142(f)(1)(A), with arson being a

2   crime of violence.   Secondly, 18 U.S.C. 3142(f)(2)(B), as the

3   defendant poses a serious risk of injury, a threatened injury

4   to witnesses in this case.

5           **THE COURT:**  Thank you, Mr. Allen.

6       Mr. Scott, the Court has received your written motion for

7   a bond which the Court has read and notes contains an objection

8   and questions to whether this case is eligible for a detention

9   hearing in the first instance.  So I'm going to hear argument

10  about that at this time.  Do you still maintain your objection

11  and position, Mr. Scott?

12          **MR. SCOTT:**  I do, Your Honor.  Does the Court wish us

13  to go into more detail?

14          **THE COURT:**  Yes, I'm going to have actual argument on

15  the motion.  Mr. Pittman, you can be seated, sir.  Mr. Scott,

16  I'm ready to hear your argument when you are ready.

17          **MR. SCOTT:**  Your Honor, under 3142, arson is not one

18  of the enumerated crimes that seeks a mandatory detention where

19  the defense has to show a presumption or rebut the presumption

20  that no conditions of release would allow him to go free in the

21  community.  The government is proceeding under a crime of

22  violence argument.  As we laid out in our motion, arson is not

23  a crime of violence.  It is not under the elements clause,

24  under 3156, and the government concedes that in their response

25  to our motion.  And their argument is that it is under the

1   residual clause.

2        The government argues that -- and we have filed a reply to

3   the government's response, Your Honor, as the Court has seen.

4   As I said, the government concedes the elements clause and goes

5   forward under the residual clause.  They cite to or compare to

6   18, United States Code, Section 16, that -- as being Congress

7   passing that at the same time.  Congress did pass the residual

8   clause in 18, United States Code, Section 16, and also in 3156

9   at the same time, and they have identical language.

10       The problem with the government's argument is, that they

11  should be the same, is that 18, United States Code, Section 16,

12  the residual clause, was found unconstitutional in *Sessions v.*

13  *Dimaya*, a Supreme Court case from 2018.  In *Dimaya*, the Court,

14  the Supreme Court, was looking at the residual clause as it

15  applied to removal proceedings, a civil proceeding.  The

16  government has gone to great pains in their response to argue

17  that this is not a sentencing scheme like 924(c) or any other,

18  where *Johnson* or *Davis* had held residual clause

19  unconstitutional, that this is simply a detention hearing, that

20  this is whether or not Mr. Pittman gets out of jail.

21       And according to the same as 18 -- you know, code 16,

22  Section 16, the government says it is the same.  In the *Dimaya*

23  case, it was a civil, and the Court recognized it was a civil

24  proceeding to have someone removed.  So it's not as serious as

25  someone being sentenced as it would be under 924(c) *Davis* or

1  even *Johnson* residual clause.  It is our position that under

2  3156, just like under Section 16, the residual clause is not

3  constitutional.  It is overbroad and is vague.

4       Now, as I said, the government goes through arguments in

5  their response in arguing that Beckles, in looking at the

6  sentencing guidelines and their definition of what is a crime

7  of violence, that it can't be void for vagueness because it is

8  sentencing guidelines.  It is our argument that that does not

9  apply because 3156 defines what a crime of violence is, not the

10 sentencing guidelines.

11      And so looking at their agreement that the elements clause

12 does not meet the definition of crime of violence for arson,

13 looking at 3156 as being unconstitutional for void for

14 vagueness, then there is no grounds for him to be detained.

15      The government, in their response to our motion, came up

16 with new grounds.  In their grounds they argue -- and they have

17 not provided any evidence to the Court of serious risk to

18 witnesses or serious risk to flight.  We argue in our initial

19 motion the 3142(g) factors to look at in Mr. Pittman's case,

20 lifelong resident, he has no job.  I know in the pretrial

21 services report he reported some income, but there is no

22 income.  He has ties to the community.  He graduated from

23 school here in the Central Mississippi area.  He has family

24 here.  He has no ability to flee.

25      And so the government, without putting forward any

1    evidence, even by proffer of a serious risk to flee, the

2    pretrial services report rebuts that presumption, that notion

3    that he is a serious risk of flight.

4         Now as to the serious risk of danger to witnesses,

5    Mr. Pittman has threatened no one in particular.  He may have

6    made general threats, but there's no evidence that he would be

7    a threat or a danger to any member of Beth Israel Congregation,

8    that there's no evidence that he would be a witness -- or a

9    danger to any particular witness.  The government has not

10   identified any actual witnesses to the crime that he is charged

11   with.

12        And so it is our argument that he is eligible for bond,

13   that the Court has conditions that the Court can set to ensure

14   his appearance in court and to ensure the safety of the

15   community.  And so the conditions that the Court has available

16   to it is such that it can give him bond and allow him to be

17   free pending resolution of this charge.

18        If the Court has any questions, I will be happy to answer

19   the questions, Your Honor.

20        **THE COURT:**  Thank you, Mr. Scott.  At this time, I'm

21   going to hear a response from Mr. Allen.

22        **MR. ALLEN:**  May it please the Court.

23        **THE COURT:**  Yes, you may proceed.

24        **MR. ALLEN:**  Yes, Your Honor.

25        There's an authority I would like to cite for the Court in

1  addition to what's in our brief that I located this morning.
2  It's *United States versus Watkins*.  It's a decision of the
3  Fourth Circuit Court of appeals.  The citation is 940 F.3d 152.
4  It's a 2019 case.  It stands for the same thing that the
5  *Liccardi* decision stands for that we cited and discussed in our
6  brief.  The *Liccardi* decision was a District Court decision out
7  of the Fifth Circuit where that District Court correctly
8  concluded, the government would submit, that the residual
9  clause can be constitutionally applied in the detention hearing
10 context.

11      *Watkins* stands from the same thing because the government
12 is submitting here that arson, the crime of arson, the federal
13 crime of arson, meets that residual clause for the definition
14 of a crime of violence, and if that residual clause can be
15 constitutionally applied in this detention hearing context to
16 submit the defendant to a detention hearing.  And to quote the
17 Fourth Circuit Court of Appeals out front at the beginning of
18 the opinion, "In so doing, we reject *Watkins'* vagueness
19 challenge to the residual clause in the Bail Reform Act's
20 definition of crime of violence."  Because all of the decisions
21 that have been cited by the defendant about these vagueness
22 challenges to the residual clause are in the context of 924(c)
23 statutes that are defining a crime and subjecting someone to
24 certain penalties.  That's not true in the detention hearing
25 context.  In the *Watkins* panel of -- sorry.  I apologize.

1    That's the Second Circuit.  The Second Circuit Court of

2    Appeals, but the *Watkins* panel of the Second Circuit Court of

3    Appeals walks through the analysis of why, and it points to a

4    decision of the Supreme Court from 2017 which is *Beckles versus*

5    *the United States*, 137 Supreme Court 886, where the Supreme

6    Court held that the residual clause in a particular part of the

7    sentencing guidelines was immune to these type of void for

8    vagueness challenges.

9        So that particular part of the sentencing guidelines dealt

10    with armed career criminals or career offenders.  There is a

11    career offender enhancement in the sentencing guidelines, and

12    the Supreme Court had rejected a void for vagueness challenge

13    there.

14        Similar here in the detention context, arson can and

15    should, the government would submit, be appropriately

16    considered a crime of violence, which is the conclusion reached

17    by a number of courts that are cited in the response briefing

18    of the government to the defendant's motion.

19        On this idea of the amended motion for the detention where

20    the government is now also asserting that detention is

21    appropriate on the second basis, we stand by that it is

22    appropriate on the first basis, this crime of violence, but

23    also that the defendant, and I will quote the statute,

24    3142(f)(2)(B), and this can be on the motion of the government

25    or upon the judicial officer's own motion, per the statute.

1    The statute says, "In a case that involves, B, a serious risk

2    that such person will obstruct, or attempt to obstruct justice

3    or threaten, injure or intimidate, or attempt to threaten,

4    injure or intimidate, a prospective witness or juror."

5        The government will proffer to the Court that it intends

6    to elicit testimony from a Special Agent of the FBI that the

7    FBI learned from the parents of the defendant that they were

8    fearful of him, that that fearfulness of him scared the father

9    from directly contacting law enforcement in the presence of the

10   son because of what might happen, that the mother had wanted to

11   and was planning to have the doors locked in the house, certain

12   doors locked in the house because she was scared of the son.

13   They are prospective witnesses in a future trial of the

14   defendant.  And because of that, that evidence and the risk,

15   the government is obviously alleging that he set fire to Beth

16   Israel, and because of other remarks the Court will hear about

17   in a hearing, antisemitical remarks, the risk that he would

18   pose to witnesses affiliated with Beth Israel and the Institute

19   housed in that building, the government submits that a

20   detention hearing and detention is also warranted under that

21   second statute.

22       So there's really two grounds, two avenues the government

23   is submitting are appropriate here:  The crime of violence

24   avenue, under 3142(f)(1)(A); and then the serious risk the

25   defendant poses to prospective witnesses, under 3142(f)(2)(B).

1    That is all, Your Honor.  I would be happy to answer --

2         **THE COURT:**  Is the government still proceeding under

3    that the defendant poses a serious risk of flight that was

4    asserted in your response motion?  Are you still pursuing those

5    grounds, or are you no longer pursuing that one?

6         **MR. ALLEN:**  In the response briefing, Your Honor, was

7    there a notation in there that he was a serious risk of flight?

8         **THE COURT:**  Yes.

9         **MR. ALLEN:**  The ground here -- unless evidence comes

10   out in testimony that would support that type of argument, the

11   argument that the government is pursuing right here is the

12   serious risk that the defendant poses to prospective witnesses.

13        **THE COURT:**  All right.  Whereas I'm required to make

14   a preliminary inquiry -- as I'm trying to determine the

15   eligibility to have the hearing, I have to make a preliminary

16   inquiry into the factual basis for either a serious risk of

17   flight or a serious risk of obstruction or danger to witnesses

18   or others, as I'm trying to elicit that factual information.

19   But a serious risk of flight is not currently on the table,

20   then.  I understand where you are coming from.

21        **MR. ALLEN:**  Yes, Your Honor.

22        **THE COURT:**  Thank you, Mr. Allen.  Mr. Scott, any

23   rebuttal?

24        **MR. SCOTT:**  Your Honor, the defense would argue that,

25   one, that Beckles is inapposite to the argument here before us

1  on 3156, where there is a crime of violence as applied under

2  3142.  The government wants to argue that because the

3  sentencing guidelines were not allowed to be challenged for a

4  void for vagueness argument in 2017, that somehow that

5  overrules their own argument under 18, United States Code,

6  Section 16, as it relates to 3156, which was found to be void

7  for vagueness as it applied to the immigration context, a civil

8  context.  And so it's our argument that Beckles is inapposite

9  to what the argument is here today.

10         In *Dimaya*, *Sessions v. Dimaya*, the Supreme Court case

11  decided in April of 2018, the Court recognized that in certain

12  contexts, civil context being one of them, that void for

13  vagueness would be a less stringent standard as in a criminal

14  statute.  But even in that case, they overruled the lower court

15  in finding that 18, United States Code, Section 16 was void for

16  vagueness and unconstitutional, the same statute that the

17  government concedes was passed at the same time as the

18  definition of crime of violence in 3156, the same statute that

19  the government tells the Court to look at in finding its -- in

20  finding that this is not void for vagueness in 3156.  It has

21  been found void for vagueness.  So we would argue that the

22  residual clause does not apply.

23         As to the 3142(f)(2) factors, obviously the government has

24  conceded flight, so we would look at danger to the community,

25  or danger to witnesses or danger to others.  Certainly there is

1    danger to various people whenever anyone is released.  However,

2    Congress put in there that there should be a serious risk of

3    danger.

4        Now, whether or not your child is going to be mad because

5    you called the police on them is different than a serious

6    danger that they would harm a witness.  So it is our argument

7    that because the government hasn't met that burden, they have

8    shown no danger to the parents.  They show only -- they make

9    the comment that they were fearful at the time this incident

10   occurred in calling law enforcement.  There's no evidence that

11   they are fearful now.  There is no evidence that he is a

12   serious danger to them.  And certainly they don't argue that

13   there is a serious danger to any other specific witness.  They

14   only argue that there's a global concern because of antisemitic

15   comments.  There's no antisemitic comments directed to an

16   individual person.  There's no list of jurors that the

17   government has shown that they are concerned about in this

18   case, only the parents who have not said they are concerned --

19   they have a serious concern about him, only that at the time

20   they were concerned.

21       And so what they proffer does not meet the threshold

22   required by Congress in enacting 3142.  And it's our position

23   that as 3142 is mandatory within certain exceptions, the

24   government hasn't met those exceptions, and so Mr. Pittman

25   should be granted bond with conditions of release.  Certainly

1   the judge -- Your Honor can fashion certain conditions, home

2   confinement, radio monitoring, no contact with various

3   individuals and things of that nature.  So the Court has the

4   tools in order to give him bond to ensure his appearance and

5   that he's not a danger.  As I said, the government has failed

6   to show he is a serious danger, and so we would ask the Court

7   to grant bond.

8          **THE COURT:**  Thank you, Mr. Scott.  Before conducting

9   a detention hearing, the Court has to be satisfied the case is

10  eligible under Section 3142(f).  The case has to meet one of

11  seven criteria in order to move forward with a detention

12  hearing.  Here the government is asserting that this case is

13  eligible for a detention hearing based on the fact that the

14  defendant is charged with a crime of violence, and of course,

15  the Court has heard extensive argument from both parties, as

16  well as written briefing as to whether arson constitutes a

17  crime of violence.  And the government also argues that there

18  is a serious risk that the defendant will obstruct justice or

19  threaten, injure, or intimidate a prospective witness or juror,

20  which is under 3142(f)(2).  So those are the bases by which the

21  government asserts that this case is indeed eligible for a

22  detention hearing.

23         In order to make a determination as to whether a case is

24  in fact eligible, the Court has to hear some preliminary

25  evidence on the issue which it heard through the government's

proffer.  The Court believes the government has made a

sufficient proffer to move forward under the grounds of serious

risk that the defendant will obstruct justice or threaten,

injure, or intimidate a prospective witness or juror.  The

Court only has to find that one of the seven categories exist

in order for the case to be eligible for a detention hearing.

The Court declines at this time to make a ruling.  Although the

arson is indeed included in the crime of violence, such a

ruling isn't required by this Court, since the Court does find

that the government has made a sufficient showing to move

forward with the hearing on -- under 3142(f)(2).

So we will move forward with the hearing.  And I believe

the parties are prepared to proceed today.  Is the government

ready to proceed with the detention hearing, Mr. Allen?

**MR. ALLEN:**  The government is, Your Honor.

**THE COURT:**  Mr. Scott, is the defense ready to

proceed with the detention hearing?

**MR. SCOTT:**  We are, Your Honor.

**THE COURT:**  Thank you.  So Mr. Allen, the government

can move forward with calling its first witness.

**MR. ALLEN:**  Yes, Your Honor.  The government would

first proffer into evidence under seal as Government's Exhibit

Number 1 the pretrial services report prepared by United States

Probation.

**THE COURT:**  Any objection to that, Mr. Scott?

1          **MR. SCOTT:**  No objection under seal, Your Honor.

2          **THE COURT:**  Okay.  The pretrial services report shall

3     be admitted under seal as Government's Exhibit G-1.

4          (EXHIBIT G-1 MARKED)

5          **MR. ALLEN:**  Your Honor, the government calls Special

6     Agent Ariel Williams of the Federal Bureau of Investigation.

7          **THE COURT:**  Okay.  Agent Williams, if you would place

8     your left hand on the Bible and raise your right hand, please.

9          **(OATH ADMINISTERED.)**

10         **THE COURT:**  You may be seated.  I would ask if you

11    would speak into the microphone, please, and you may have to

12    pull it close to you.  Mr. Allen, you can begin.

13         **MR. ALLEN:**  Thank you, Your Honor.

14                          **ARIEL WILLIAMS,**

15    **having first been duly sworn, testified as follows:**

16                        **DIRECT EXAMINATION**

17    BY MR. ALLEN:

18    Q.  Good afternoon, Special Agent Williams?

19    A.  Good afternoon.

20    Q.  Would you introduce yourself to the Court?

21    A.  Yes, I am Special Agent Ariel Williams with the FBI in

22    Jackson.

23    Q.  In your role with the FBI, are you familiar with an

24    investigation into Stephen Spencer Pittman?

25    A.  Yes, I am.

1   Q.   And is that for the arson of the building at 5315 Old

2   Canton Road?

3   A.   Yes.

4   Q.   How are you familiar with this investigation?

5   A.   I'm familiar through speaking with colleagues, agents

6   associated with the case, and through my own review of the case

7   file.

8   Q.   Is that in your role as a Special Agent with the FBI?

9   A.   Yes, sir, it is.

10  Q.   How did the FBI learn about this event?

11  A.   The FBI learned about this event through a couple of

12  different avenues, one of them being an employee with the

13  Institute of Southern Jewish Life contacted the FBI directly to

14  alert them to a fire at the building for the Beth Israel

15  Congregation and later supplied CCTV surveillance footage of an

16  individual at Beth Israel Congregation.  Also happening

17  simultaneously was an individual contacted local law

18  enforcement in Madison to let them know that they were aware of

19  a fire at Beth Israel Congregation and the defendant's

20  potential connection with it.

21  Q.   I will ask you right now, though we may talk a little bit

22  more about this later, why did that individual think that

23  Mr. Pittman might be involved in this fire?

24  A.   This individual was an associate of Mr. Pittman and had

25  heard Mr. Pittman say to him directly that he wanted to burn a

1    synagogue.

2    Q.   What date was this fire?

3    A.   This fire was January 10th of this year.

4    Q.   On January 10th, that day, did the FBI have an opportunity

5    to interview the father of the defendant?

6    A.   Yes, they did.

7    Q.   What did the FBI learn from the defendant's father?

8    A.   We learned from the defendant's father that he had an

9    application on his phone, Life360, that had GPS tracking data,

10   and he saw that his son, Mr. Pittman, the defendant, had

11   traveled from their home to the Beth Israel Congregation.  We

12   also learned from the defendant's father that he had text

13   messages exchange with Mr. Pittman while he was at the Beth

14   Israel Congregation in the early hours of January 10th, and so

15   the father reached out to law enforcement because he wanted to

16   speak with the FBI regarding that information.

17   Q.   What did some of those texts communicate?

18   A.   The text messages included a photo of the building of Beth

19   Israel Congregation.  It identified a furnace in the picture.

20   There were also text messages from the defendant saying that he

21   had removed his plate, seemingly indicating that he had removed

22   his license plate.  It also said his hoodie was on, and other

23   somewhat erratic messages to the father that he didn't quite

24   understand.

25   Q.   Let me ask you, did the defendant notice anything about

1    the -- did the defendant's father notice anything about the

2    defendant's appearance when he spoke to the defendant the

3    morning of January 10 at their home?

4    A.   Yes.   When the defendant's father saw him on the morning

5    of January 10th, he noticed that the defendant had burns on his

6    ankles and hands, and so he proceeded to question the defendant

7    about where the burns came from.

8    Q.   What did the defendant tell his father about where the

9    burns had come from?

10   A.   After some back and forth, according to the defendant's

11   father, eventually Mr. Pittman admitted to burning the

12   synagogue.

13   Q.   Would you tell the Court about the father's

14   decision-making process when he learned this, when the son

15   admitted he burned the synagogue, about the father's

16   decision-making process, how it had been impacted?

17              **THE COURT:**  Wait one second.   Mr. Scott?

18              **MR. SCOTT:**  Your Honor, I would ask that the Court

19   require the government to establish the basis of this agent's

20   knowledge of what the father said.   I understand that hearsay

21   is allowed, the rules of evidence are relaxed, but if this is

22   something that was said directly to her, I understand, but if

23   it was something said to another agent that was in a report

24   that was read by her, then we are getting into triple,

25   quadruple hearsay, and we would ask the Court to take proper

1   account of that if that's the case.

2           **THE COURT:**  Mr. Allen, can you lay a foundation.

3   Rephrase the question, please.

4           **MR. ALLEN:**  I can, Your Honor.

5   **BY MR. ALLEN:**

6   Q.  Special Agent Williams, how did you learn about the

7   father's interview?

8   A.  I learned through the Special Agent that was involved in

9   the interview with the father, and then I also read the report

10  that was written following that interview.

11  Q.  What have you learned about the father's decision-making

12  process after he learned of these burns and where they came

13  from and what steps he took next?

14  A.  The father explained to the FBI that due to recent

15  behaviors from the defendant, he was hesitant or afraid to

16  contact law enforcement in front of the defendant.  He spoke

17  with his wife, had a conversation with her, and they devised a

18  plan for her to take the defendant to the hospital separately

19  so that the father could then contact law enforcement out of

20  view of the defendant.

21  Q.  What behavior had the father observed from the defendant

22  that made him concerned and fearful?

23  A.  The father expressed that there had been recent behavior

24  changes in the defendant since he had come home from winter

25  break from school, that he and his wife had experienced

1    somewhat erratic behavior, antisemitic statements, things that

2    made them uncertain of how he would react.  And so for that

3    reason, it contributed to them not wanting to contact law

4    enforcement in front of him.

5    Q.   What did the FBI learn from defendant's mother?

6    A.   The mother, once we spoke with her -- the mother spoke

7    with the FBI following the defendant being taken into custody

8    and a search warrant being executed, and the mother expressed a

9    sense of relief.  She stated that they were at the point where

10   the family pets were afraid of the defendant, and also that

11   they were considering locking their doors, their bedroom doors

12   at night due to fear of his behavior.

13   Q.   Has the FBI had an opportunity to interview associates or

14   acquaintances of the defendant?

15   A.   Yes.  The FBI has interviewed associates that attend the

16   same gym as the defendant, as well as prior teammates of the

17   defendant.

18   Q.   What has the FBI learned from those associates?

19   A.   The majority of those associates have expressed that they

20   began recently hearing the defendant make multiple antisemitic

21   comments to the associates that attend the same gym as the

22   defendant, said that they heard the defendant say directly that

23   he wanted to burn a synagogue, with one of those witnesses

24   having heard it the day before the crime took place.

25   Q.   Has the FBI had an opportunity to interview the defendant?

1    A.   Yes, they have.

2    Q.   When did that interview occur?

3    A.   That interview occurred while the defendant was being

4    treated at UMMC for his burns.

5    Q.   What did the FBI learn during that interview?

6    A.   During that interview, the defendant confessed to setting

7    the fire at Beth Israel Congregation.  He went on to describe

8    sort of the timeline of events for those early morning hours,

9    and he also connected or provided his reasoning as being in

10   relation to the building's association with the Jewish

11   community and described it as the synagogue of Satan.

12   Q.   A couple of just brief questions about the interstate

13   commerce component to this element.  What entities are located

14   at 5315 Old Canton Road?

15   A.   The building houses the Beth Israel Congregation, as well

16   as the Institute of Southern Jewish Life.

17   Q.   What do you know about where Beth Israel publishes its

18   services?

19   A.   Beth Israel publishes its services on YouTube, allowing

20   anyone in any state to view its services.

21   Q.   What do you know about the Institute of Southern Jewish

22   Life and at least some of its interstate activity?

23   A.   The Institute of Southern Jewish Life is a non-profit.  It

24   provides social services, traveling rabbis, after-school

25   programs, to Jewish communities in at least 12 or 13 other

1    states.

2              **MR. ALLEN:**  Your Honor, I will tender the witness.

3              **THE COURT:**  All right.  Thank you.  Mr. Scott,

4    cross-examination.

5              **MR. SCOTT:**  Thank you, Your Honor.

6                        **CROSS-EXAMINATION**

7    BY MR. SCOTT:

8    Q.  Agent Williams, how long have you been with the FBI?

9    A.  Four and a half years, sir.

10   Q.  Always in the Jackson area?

11   A.  No, sir, I've been in the Chicago division as well.

12   Q.  How long have you been in Jackson?

13   A.  I've been in Jackson for almost two years.

14   Q.  Now, in your role as part of this investigation -- let me

15   ask you, what is your role in this investigation?

16   A.  I'm simply a Special Agent with the FBI, with the

17   Jackson's headquarter division.

18   Q.  So you didn't respond to Beth Israel?

19   A.  No, sir, not directly, I did not.

20   Q.  You haven't interviewed anybody?

21   A.  No, sir.

22   Q.  You haven't investigated this case?

23   A.  No, sir.

24   Q.  Your role is strictly to read reports and appear in this

25   court for this hearing, correct?

1    A.   Yes, sir, to review case files and speak with other agents

2    involved directly in the case.

3    Q.   So your knowledge is not directly from your role as an

4    investigator in this case?

5    A.   Correct, sir.

6    Q.   Okay.  Now, the ISJL, you've read the file, correct?

7    A.   Yes, sir.

8    Q.   You've reviewed the crime scene photos, correct?

9    A.   Some of them, yes, sir.

10   Q.   Some of them.  What property of the ISJL was damaged?

11   A.   The building --

12           **MR. ALLEN:**   Objection, Your Honor, relevancy.

13           **MR. SCOTT:**   The government brought it up in the

14   context the interstate commerce aspect of this in asking the

15   witness about the ISJL.  My question is, what was damaged with

16   the ISJL?

17           **THE COURT:**   I'm going to overrule the objection at

18   this time, Mr. Allen.

19   A.   As far as I understand, the building is a shared building

20   with the specific area that was most I guess deteriorated or

21   affected by the fire, being the Beth Israel Congregation side

22   of the building.

23   **BY MR. SCOTT:**

24   Q.   Okay.  So the ISJL, is it on the opposite side of the

25   building?

1    A.  They share services, so I think the offices are on the

2    opposite side of the building.

3    Q.  Okay.  Now, when you interviewed Spencer Pittman, what

4    were his comments about the ISJL?  Or not you.  Sorry.  I hate

5    to say you, but the agent's interview.  What were his comments?

6    A.  Mr. Pittman did not specifically mention ISJL.

7    Q.  Was he asked about ISJL?

8    A.  No, sir, he was not.

9    Q.  So there is no evidence that he knew about the ISJL?

10    A.  Not that I know of.

11    Q.  Now, you talked about the parents -- and your own

12    testimony was that the father was hesitant to contact law

13    enforcement, correct?

14    A.  Sure.  He was hesitant and afraid.

15    Q.  Well, you said hesitant and now you say afraid, but what

16    specific threats did Mr. Pittman, Spencer Pittman make to

17    Mr. Pittman?

18    A.  So the defendant's father -- sorry, just for clarity --

19    the defendant's father didn't mention a specific threat.  He

20    mentioned a previous incident with the mother and the father in

21    which the defendant said something offensive to the mother.

22    And when the father attempted to step in, he specifically said

23    that the defendant bowed up to him, as in he got up and jumped

24    at him, and so he was fearful that he would react physically.

25    Q.  But he didn't?

1   A.  Sorry?

2   Q.  But he did not?

3   A.  No, at that time, he did not.

4   Q.  And what specific threats did Spencer Pittman make to his

5   mother?

6   A.  As far as I know, he made more offensive statements, and

7   his behavior is what the mother was in fear of.

8   Q.  But you don't know?

9   A.  I'm sorry?

10  Q.  But you don't know?

11  A.  Don't know what?

12  Q.  Specific threats.

13  A.  No, I don't know the specific phrases.

14  Q.  So when Spencer Pittman was interviewed in the hospital by

15  Agent Amiano, who else was present at that interview?

16  A.  Well, just for clarity, when Special Agent Amiano arrived,

17  it was more so for the process of the arrest the following.

18  Mr. Pittman was initially interviewed by a separate Special

19  Agent.  That interview occurred earlier.

20  Q.  Both parents were present, though, when they arrived,

21  correct?

22  A.  The mother was present.

23  Q.  And the father has been cooperative?

24  A.  Yes, sir.

25  Q.  And he has not expressed any other fears other than what

1    was initially offered?

2    A.  At the interview?

3    Q.  Correct.

4    A.  With him directly?

5    Q.  Correct.

6    A.  Yes, that was the time he expressed fears.

7    Q.  And when warrants were served this weekend, did he express

8    any fears?

9    A.  I wouldn't know that.

10   Q.  Okay.  But you reviewed the file?

11   A.  Yes.

12   Q.  And you were aware that warrants were served?

13   A.  Yes, sir.

14   Q.  So you don't know of any specific threats at that time?

15   A.  No.

16   Q.  Okay.  Now, you talked about reviewing texts and that

17   there were erratic messages.  What erratic -- well, can you go

18   more in detail about what those messages were?

19   A.  Sure.  They were messages that the defendant sent his

20   father upon arriving at the location of the building where he

21   sent a picture, he mentioned the furnace.  He said, plate is

22   off, hoodie is on, things that the father was not a hundred

23   percent what he was referring to at that time.

24   Q.  And I understand you testified about that on direct, but

25   then you added erratic messages in addition to that.  What are

1  those erratic messages?

2  A.  No, I only meant the messages that were being sent back

3  and forth in the January 10th hours while the defendant was

4  traveling to the building and while he was at the building.

5  Q.  The associates that were interviewed by the FBI, how many

6  of those expressed fear of Mr. Pittman?

7  A.  More of them expressed comments about his behavior.  They

8  did not directly say that they were in fear of him.

9  Q.  Okay.

10      **MR. SCOTT:**  Court's indulgence, if I may, Your Honor.

11  **BY MR. SCOTT:**

12  Q.  I'm going to go back to the interstate commerce aspect

13  that the government brought up.  Other than YouTube, what other

14  aspect of interstate commerce does Beth Israel Congregation

15  have links to?

16      **MR. ALLEN:**  Objection, Your Honor, not a probable

17  cause hearing.  It is a detention hearing.  And not to cover

18  the elements, but I think he is going to get into irrelevant

19  material and going beyond the scope of a detention hearing at

20  this point.  It's a discovery matter, and detention hearings

21  are not for the purpose of discovery.

22      **MR. SCOTT:**  I understand that, Your Honor, but the

23  government opened the door when they brought in -- and

24  specifically talked about the interstate commerce aspect of

25  this charge, and so they are the ones that brought up YouTube,

1    so I think we are allowed to explore it.  If it's simply one

2    aspect, we are allowed to go into it because the government,

3    quite honestly, opened the door to it.

4         **THE COURT:**  The Court is going to overrule that

5    objection on the grounds that the government did open the door

6    in its direct examination to this area of questioning.

7    A.  Could you repeat the question.

8    **BY MR. SCOTT:**

9    Q.  The government asked you and you've stated that Beth

10   Israel has interstate contacts through posting their services

11   on YouTube.

12   A.  Yes, sir.

13   Q.  What other interstate contacts do they have?

14   A.  The only direct connection that I know is their

15   partnership with ISJL.

16        **MR. SCOTT:**  Court's indulgence, if I may, Your Honor.

17   No further questions, Your Honor.

18        **THE COURT:**  Redirect, Mr. Allen?

19        **MR. ALLEN:**  Yes, Your Honor.

20        **THE COURT:**  You may proceed.

21                      **REDIRECT EXAMINATION**

22   **BY MR. ALLEN:**

23   Q.  Special Agent Williams, you wouldn't know about all the

24   interstate commerce connections that Beth Israel or the

25   Institute have, would you?

1    A.  No, I would not.

2         **MR. SCOTT:**  Your Honor, I'm going to object.  The

3    government has made clear that she has reviewed the entire

4    file, that she has read reports, and so she is speaking from

5    what she knows from these reports.  So we are getting into a

6    very -- outside the scope of what the government has already

7    offered her as.  Essentially but not really an expert in this

8    case because she has gone through the entire file, so she

9    should know what interstate nexus they have with the

10   congregation.

11        **THE COURT:**  I'm going to allow the testimony because

12   of the testimony that was elicited in the questions that were

13   asked and the testimony elicited during cross-examination.  You

14   may proceed, Mr. Allen.

15   **BY MR. ALLEN:**

16   Q.  And I believe you answered no?

17   A.  Correct.

18   Q.  A moment ago you were asked about the situation where the

19   defendant bowed up to the father?

20   A.  Yes.

21   Q.  And you were asked if that escalated into a fight, I

22   believe, or something to that effect?

23   A.  Yes.

24   Q.  Who diffused that situation?

25   A.  The father.

1    Q.  Let me ask you about -- you were asked a moment ago about

2    warrants being served at the home.

3    A.  Yes.

4    Q.  And you were asked if the father was fearful at that time.

5    A.  Correct.

6    Q.  Was the defendant present at the home when those warrants

7    were served?

8    A.  No, he was not.

9    Q.  Where was the defendant?

10   A.  The defendant was in custody at that time.

11            **MR. ALLEN:**  Thank you.  That's all.

12            **THE COURT:**  Agent Williams, you may step down now.

13   Mr. Allen, any additional witnesses for the government?

14            **MR. ALLEN:**  No, Your Honor, the government rests.

15            **THE COURT:**  Mr. Scott, will there be any witnesses or

16   proffers for the defense?

17            **MR. SCOTT:**  No, Your Honor, no witnesses.

18            **THE COURT:**  Okay.  We will move into closing

19   arguments then at this time.  Mr. Allen, we will hear from the

20   government first.

21            **MR. ALLEN:**  Yes, Your Honor.  May I proceed?

22            **THE COURT:**  Yes, you may.

23            **MR. ALLEN:**  Looking at the factors of 18, U.S.C.,

24   Section 3142(g) that govern whether detention should be imposed

25   or bond granted, the first factor, the nature and circumstances

1   of the offense charged, I know that the Court has reserved

2   ruling on whether arson is a crime of violence or not.  As the

3   Court is aware, it's the government's position that it is.  If

4   that position were to be accepted, a crime of violence is

5   expressly listed under that provision.

6       I will add to that.  Regardless of what the Court finds or

7   whether arson fits under the legal definition of crime and

8   violence, we have more of the layperson's approach to this and

9   the way they describe it for the nature and circumstances of

10  the offense charged.  And the government is alleging that the

11  defendant set fire to a Jewish place of worship, and that that

12  should be considered appropriately under the nature and

13  circumstances of the offense charged.  It's an intentional

14  setting fire to a religious structure and comments that were

15  made in the days and time period leading up to that where he

16  was targeting Jewish persons.

17      The weight of the evidence against the person, the

18  government would submit it is strong.  We have admissions by

19  the defendant really through two doorways.  One is through the

20  father, where the father says that the defendant admitted to

21  him that he had set fire to Beth Israel.  We have admissions by

22  the defendant directly to the FBI.  We have the father

23  observing the burns on the son.  There's the text message

24  traffic, the Life360 GPS data that put the defendant at Beth

25  Israel.

1          As the Court considers whether the defendant is a risk to
2    prospective witnesses, the government submits that it is
3    appropriate to consider his behavior in the time period leading
4    up to the event, the fearfulness of the family, both the father
5    and the mother who have expressed that fear in different ways.
6    The mother wanted to lock certain doorways of the house, the
7    father being afraid to contact law enforcement in the presence
8    of the son.  The third factor -- so the government, again, for
9    that second factor, weight of the evidence -- weight of the
10   evidence against the person, the government submits it's
11   strong.
12         The third factor, the history and characteristics of the
13   person.  Under that subprong A, past conduct, history relating
14   to drug or alcohol abuse.  We are talking about past conduct
15   here.  The government reports the antisemitic language used by
16   the defendant in the period leading up to the arson,
17   antisemitic language generally -- I mean, there are two
18   specific comments made to two persons known to the defendant
19   about his desire to set fire to a synagogue.  There's the
20   history of drug abuse of the person.  The pretrial services
21   report notes that he has been an occasional user of marijuana
22   from the age of 14 to the present.
23         His employment, the government submits, would be unclear.
24   He describes himself as having employment as a day trader, but
25   there's no notation of any type of employment where he would

1    report on a regular basis anywhere.

2        The nature and seriousness of the danger to any person --

3    the fourth factor, the nature or seriousness of the danger to

4    any person or the community that would be posed by the person's

5    release.  Again, I will circle back to the seriousness of the

6    danger with this particular person, the defendant, the

7    combative, the language with the parents that made them

8    fearful, the antisemitic language, telling others that he would

9    burn a synagogue.  Also, in describing this crime to the FBI

10   when he admitted that he set fire to Beth Israel, describing it

11   as the synagogue of Satan.  His parents were afraid of him, the

12   mother and the father, as previously noted.

13       The government submits that the four factors under 3142(g)

14   weigh in favor of the defendant being detained.  Thank you,

15   Your Honor.

16              **THE COURT:**  Thank you, Mr. Allen.  Mr. Scott?

17              **MR. SCOTT:**  Your Honor, we began this hearing with

18   the government making the proffer that there is a serious

19   danger to witnesses, specifically the parents in this case.

20   And the agent testified -- she initially -- she testified that

21   Mr. Pittman, Sr., the father, was hesitant to contact law

22   enforcement.  She did not say until cross-examination that he

23   was afraid, and even when she said he was afraid on redirect,

24   she said the father was able to diffuse the situation.  She

25   said that the mother was uncertain how he would react.  There

1    was no evidence of any threats towards the parents, no evidence

2    that he would harm either one of those parents.

3         So to begin with, the government has not met its burden to

4    show that there is a serious risk of danger to someone else.

5    We still maintain that this is not a crime of violence.  I know

6    the Court has not ruled on that, but we still maintain that

7    this is not a crime of violence.  And they have to meet their

8    burden to show he is a serious danger to a witness or a juror.

9    In fact, the other witnesses that were interviewed did not

10   express any fear of Mr. Pittman.  So the parents, even on

11   direct examination, were not shown to have a serious risk of

12   danger by Spencer Pittman.  So it's our belief that with just

13   that alone, Spencer Pittman should be granted bond.

14        Now, the government goes through the factors, and as we

15   cited in our initial motion, we cited to a Ninth Circuit case,

16   *United States versus Hir*, and we argue that even if the Court

17   chooses to consider the weight of the evidence supporting

18   guilt, this should be treated as the least important of the

19   3142(g) factors.  And what *Hir* actually said is, "We recognize

20   the weight of the evidence is the least important of the

21   various factors."

22        So the government has sought to play the Court's emotions,

23   and quite honestly the emotions of the crowd in arguing, oh, he

24   said antisemitic things, he said this, he said that.  But he's

25   not expressed an exact -- a direct danger, other than his

1    action, the one time, the comment on his actions on the morning

2    of Saturday, he has not expressed any other threats to anyone

3    else.  He is a lifelong resident of the Central Mississippi

4    area.  He has no criminal history, which goes into the

5    characteristics of Spencer Pittman.  He does not have an

6    incentive to flee because he is from this area.  His family is

7    from this area.  And so he does not have that incentive.  He

8    doesn't have the financial resources even if he wanted to flee

9    or be a danger to anyone else.  He does not have those

10   financial resources.

11       His physical condition, as the Court has heard, he has

12   been in the hospital.  I can proffer to the Court that he had

13   third degree burns on various parts of his body.  The Court can

14   observe him in court today.  Both hands are bandaged, and both

15   ankles are bandaged, and they have to be rewrapped daily

16   because of his burns.  So he is in no physical condition to

17   flee.

18       The government argues that we don't have -- he doesn't

19   have a job -- and I wrote it down.  Unclear employment.  The

20   Court is aware, though, that the conditions of bond, the Court

21   can require him to seek employment once his injuries are

22   healed.  His occasional use of marijuana, the Court actually

23   has tools to ensure compliance that he does not smoke marijuana

24   or use any other drugs.  There is drug testing the Court can

25   order, and probation has provided in the past, upon the Court's

1    order, drug treatment, if needed or necessary.

2         And so what we have, what it boils down to is, we don't

3    have a showing that there is a serious danger to the parents.

4    We have a play to a motion to argue antisemitic, oh, he burned

5    a synagogue, oh, he did this, but the factors, when you look at

6    them, and when you look at the pretrial services report, you

7    see that the factors support release on bond in this case with

8    conditions that the Court can fashion to ensure his compliance

9    that he is not a danger to others, he's not a danger to the

10   community, and that he will maintain lawful employment if the

11   Court so wishes.  So we would ask the Court to grant him bond

12   at this time.

13        **THE COURT:**  Thank you, Mr. Scott.  Rebuttal,

14   Mr. Allen?

15        **MR. ALLEN:**  Very briefly, Your Honor.  Just to be

16   clear, the government is arguing that all four factors weigh in

17   favor of detention in this case, both the nature and

18   circumstance of the offense.  Again, even if the Court were to

19   reach a conclusion that this does not meet the definition of a

20   crime of violence, he used gasoline to set fire to a place of

21   worship.  The weight of the evidence against the person is

22   strong.  The history and characteristics of the person, we have

23   got the past -- for the past conduct, it's the antisemitic

24   language and the period leading up to this arson, and telling

25   other people he is going to do it.  There's a risk he will do

1   it again.  There is a serious risk when it comes to the nature

2   and seriousness of the danger to any person, the government

3   submits there is a serious risk that he could intimidate -- the

4   statute says intimidate -- injure, threaten to injure a

5   prospective witness, those persons being his parents and

6   others.  Those in the Jewish community have already been

7   targeted.  So the government does submit that detention is

8   warranted this case.  Thank you, Your Honor.

9           **THE COURT:**  Thank you.  We will take a brief recess

10  and I will return with my decision.

11          **(RECESS TAKEN).**

12          **THE COURT:**  We are back on the record in the matter

13  of United States versus Stephen Spencer Pittman.  The Court has

14  been engaged in a detention hearing this afternoon.  There's a

15  motion from the government for a detention hearing pursuant to

16  18, United States Code, Section 3142(f)(1), in which the

17  government alleged arson is a crime of violence, and also by a

18  motion of the government pursuant to 18, U.S.C., Section

19  3142(f)(2), in which the government has cited there's a serious

20  risk that the defendant will obstruct or attempt to obstruct

21  justice or threaten, injure or intimidate or attempt to

22  threaten, injure, or intimidate a prospective witness or juror

23  if released.

24      The Court, after having heard arguments of counsel and the

25  proffer of the government, the testimony that would be elicited

1    as to the serious risk of obstruction or threatening of

2    witnesses, the Court found that the government had established

3    at least one factor that makes the case eligible for a

4    detention hearing, and therefore we went forward with the

5    hearing.

6        The Court then heard evidence from Special Agent Ariel

7    Williams.  The Court also took into account the pretrial

8    services report prepared by the U.S. Probation Office as well

9    as arguments of counsel in making a determination as to whether

10   Mr. Pittman could be released on conditions or whether he would

11   be detained.

12       In reaching this decision, the Court considered the

13   factors under 18, United States Code, Section 3142(g), the

14   factors in the -- that's the Bail Reform Act and the factors

15   that the Court must look at include the nature and

16   circumstances of the offense, the weight of evidence against

17   the defendant, the history and characteristics of the defendant

18   and the nature and seriousness of danger to others in the

19   community.

20       As to the nature and circumstances of the offense, the

21   defendant is present, charged with arson under 18, United

22   States Code, Section 844(i), which the government contends is a

23   crime of violence, and the defendant strenuously objects to

24   that characterization.  The Court has not yet reached a ruling

25   as to whether it indeed constitutes a crime of violence.  In

1    any event, it does carry a potentially lengthy period of

2    incarceration if the defendant were to be convicted of the

3    same.

4         The allegations involve a fire that was set at Beth Israel

5    Synagogue in Jackson, Mississippi, which is within the confines

6    of the Southern District of Mississippi.

7         The weight of evidence against the defendant:  Again, the

8    Court heard testimony from Special Agent Ariel Williams of the

9    FBI, who testified regarding the investigation into the charged

10   offense.  Agent Williams acknowledged not being one of the

11   investigating agents on the file but having reviewed the file

12   and having spoken to other agents on the file.

13        She testified the fire occurred on January 10th, 2026, and

14   that the FBI learned of it through a report from the Institute

15   of Southern Jewish Life and also a report from an associate of

16   the defendants.  She also testified to having reviewed text

17   messages between the defendant and his father, also noted

18   Life360 app noting the defendant's presence on the grounds of

19   Beth Israel, noted his father's indication that he saw burns on

20   the defendant's ankles and hands later on January 10th, and

21   that the defendant admitted both to his father and the FBI

22   during an interview that he indeed was the person who set the

23   fire.  There was also evidence that the FBI spoke to witnesses

24   and associates of the defendant, who indicated that he had

25   expressed to them his desire to burn a synagogue, including to

1    one of the persons that that desire had been expressed just the

2    day before.  The Court does find that the weight of evidence

3    against the defendant is strong, based on these and other

4    factual circumstances.

5          As to the history and characteristics of the defendant,

6    the Court notes that the defense has asserted that the

7    defendant has no criminal history, that the defendant does not

8    have financial means to flee, although the government did

9    concede that the defendant does not pose a serious risk of

10   flight here in this proceeding.  And the Court also notes that

11   the defendant asserts that due to his medical condition, he

12   also would not be someone who would flee.

13         The Court notes the government's arguments that the

14   defendant lacks verifiable employment.  The pretrial services

15   report notes a self-reporting of employment as a day trader,

16   but that employment had been for about a one-month period prior

17   to the arrest, although that information was unable to be

18   verified.

19         The government asserts a history of drug abuse, and the

20   pretrial services report reflects an occasional use of

21   marijuana from age 14 forward.  And the government asserts past

22   conduct of the defendant in terms of antisemitic language in

23   the period leading up to the event.  The government also, I

24   believe in the history and characteristics of the defendant and

25   the nature and seriousness of danger to others and the

1  community, discussed the behavior of the defendant from the

2  winter break forward and specifically evidence from his parents

3  or statements from his parents of increasingly erratic behavior

4  from the defendant where the parents expressed fear of the

5  defendant during that time period, but his mother noted a sense

6  of relief and that there's a fear for the family pets and also

7  that the parents considered locking their bedrooms due to fear

8  of the defendant's behavior.

9       The Court notes specifically, as to the nature and

10  seriousness of danger, that the Court notes the Senate report

11  number 225 from the U.S. Senate that was issued in conjunction

12  with the updates to the Bail Reform Act, the Senate report

13  notes that the reference to safety of any other person is

14  intended to cover the situation in which the safety of a

15  particular identifiable individual, perhaps a victim or

16  witness, is of concern, while the language referring to the

17  safety of the community refers to the danger that the defendant

18  might engage in criminal activity to the detriment of the

19  community.

20       The committee specifically noted that it intends that the

21  concern about safety be given a broader construction than

22  merely danger of harm involving physical violence.

23       The Court also reviewed the U.S. Supreme Court decision of

24  *U.S. versus Salerno* in which Chief Justice Rehnquist observed

25  that there's nothing inherently unattainable about predicting

1    future criminal conduct.

2         Also on the nature and seriousness of danger to others in

3    the community, the Court specifically is concerned about the

4    possibility of a concrete prospective threat to public safety

5    that is posed by the defendant, and that concrete prospective

6    threat to public safety was specifically recognized by the D.C.

7    Circuit as being sufficient to indicate that a person poses a

8    danger to the community.

9         So here, in order to detain the defendant, the government

10   has to show by a preponderance of the evidence that no

11   conditions will reasonably assure his appearance or by clear

12   and convincing evidence that no conditions will reasonably

13   assure the safety of others or the community.  Having heard all

14   of the evidence here today, the Court finds that the government

15   conceded and could not meet the standard for number 1, which is

16   that the defendant -- that no conditions will reasonably assure

17   his appearance.  There was no evidence that he was a risk of

18   flight.  However, the government has met its burden by clear

19   and convincing evidence that no conditions would reasonably

20   assure the safety of others or the community.

21        And in light of all the evidence, the Court does find that

22   Mr. Pittman shall remain detained until the date of his trial.

23   And he will remain in the custody of the U.S. Marshals Service

24   until that time.

25        Again, trial has been set for February 23rd, 2026, at

1    9:00 a.m. before District Judge Henry T. Wingate.  Mr. Allen,

2    is there anything further from the government this afternoon in

3    Mr. Pittman's case?

4              **MR. ALLEN:**  No, Your Honor.

5              **THE COURT:**  Mr. Scott, anything further from the

6    defense this afternoon in Mr. Pittman's case?

7              **MR. SCOTT:**  No, Your Honor.

8              **THE COURT:**  I believe the other matters on our docket

9    have been continued until a later date.  So not only will

10   conclude our hearing of Mr. Pittman's case, this will conclude

11   our hearing this afternoon.  We will stand adjourned.

12                          (HEARING CONCLUDED)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1

2

3                    CERTIFICATE OF TRANSCRIPTION

4

5         I, Teri B. Norton, Official Court Reporter, United

6   States District Court, Southern District of Mississippi, do

7   hereby certify that the above and foregoing pages contain a

8   full, true and correct transcript of the proceedings had in the

9   aforenamed case at the time and place indicated, which

10  proceedings were recorded by the courtroom deputy clerk and

11  later transcribed by me from a digital recording to the best of

12  my skill and ability.

13          I certify that the transcript fees and format

14  comply with those prescribed by the Court and Judicial

15  Conference of the United States.

16      This the 3rd day of February, 2026.

17

18                      s/ Teri B. Norton
                        U.S. DISTRICT COURT REPORTER
19

20

21

22

23

24

25
```